# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANGELINE GIBALA,          )
                              )
         Plaintiff,        )     **Case No. 05 C 5802**
                              )
         v.              )     **Magistrate Judge**
                              )     **Geraldine Soat Brown**
EATON CORPORATION LONG TERM  )
DISABILITY PLAN FOR U.S. EMPLOYEES,  )
                              )
         Defendant.      )

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court are cross-motions for summary judgment filed by Plaintiff Angeline Gibala ("Gibala") and Defendant Eaton Corporation Long Term Disability Plan for U.S. Employees ("the Plan"). For the reasons set forth below, the Plan's motion [dkt 26] is granted and Gibala's motion [dkt 30] is denied.

## JURISDICTION

Gibala alleges that the termination of her long-term disability benefits was wrongful under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). (Compl. ¶ 4.) [Dkt 1.] Federal jurisdiction therefore exists in this case under 29 U.S.C. § 1132(e)(1). The parties consented to the jurisdiction of a magistrate judge [dkt 10], and this case was assigned to this court pursuant to 28 U.S.C. § 636(c) [dkt 9].

## BACKGROUND[1]

Gibala was employed as an inventory clerk for approximately five years by Eaton Corporation ("Eaton") until March 9, 1995, when she stopped working due to pain in her back and legs. (Pl.'s LR Resp. ¶¶ 4, 6; Def.'s LR Resp. ¶¶ 7, 11.) As a benefit of her employment, Gibala participated in an employee welfare benefit plan that was sponsored, maintained, funded, and administered by Eaton. (Def.'s LR Resp. ¶ 8.) The named defendant in this case (*i.e.*, the "Plan") is the benefit plan in which Gibala participated, and is an "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1002(a). (Def.'s LR Resp. ¶ 8.) Gibala was a "participant" of the Plan, as defined by ERISA, 29 U.S.C. § 1002(7). (Def.'s LR Resp. ¶ 8.)

After Gibala stopped working, Eaton, through its third-party administrator Broadspire Services Inc. ("Broadspire"), awarded Gibala long term disability benefits under the Plan. (Def.'s LR Resp. ¶ 10; Pl.'s LR Resp. ¶ 6.) Eaton paid Gibala such benefits for approximately nine years after she stopped working. (Def.'s LR Resp. ¶ 10; Pl.'s LR Resp. ¶ 6.) Broadspire terminated Gibala's benefits after Gibala was physically examined by her treating physician and another evaluator, who both reported Gibala was capable of light to sedentary work. (Pl.'s LR Resp. ¶¶ 12, 14, 17.) The parties agree that all administrative or internal appeals required by ERISA have been exhausted. (Def.'s LR Resp. ¶ 4.) The issue raised by each party's motion is whether the

---

[1] The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pl.'s LR Resp. ¶ __" [dkt 38], "Defs.' LR Resp. ¶ __" [dkt 35], as well as from the administrative record, which is cited herein as: "AR __" [dkt 19]. Statements not responded to or not controverted by specific references to the record are deemed admitted. L.R. 56.1(b)(3). Furthermore, the practice of including legal conclusions and arguments in a response to an L.R. 56.1(a) statement is improper, and such conclusions and arguments will not be considered. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).

administrator's decision to terminate Gibala's benefits was arbitrary and capricious, *i.e.*, whether there is no rational support in Gibala's medical record for the administrator's decision.

## I.      The Plan's Relevant Terms

The Plan's definition of "covered disability" in the first 24 months of disability is different from the definition thereafter.  (*See* Def.'s LR Resp. ¶ 9.)  Since the initial 24-month period expired in approximately September 1997, the only definition relevant to this action is the definition Gibala was required to meet since that time:  "totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which [she is], or may become, reasonably well fitted by reason of education, training or experience."  (Pl.'s LR Resp. ¶ 9; Def.'s LR Resp. ¶ 9; AR 00047.)

The Plan also requires that a covered disability be supported by "objective findings", defined as "findings . . . that can be observed by your physician through objective means, not just from your description of the symptoms."  (AR 00052.)  The Plan lists the following particular examples of objective findings:

- Physical examination findings (functional impairments/capacity);
- Diagnostic tests results/imaging studies;
- Diagnosis;
- X-ray results;
- Observation of anatomical, physiological or psychological abnormalities; and
- Medications and/or treatment plan.

(AR 00052.)

## II.      Initial Award and Termination of Gibala's Long Term Disability Benefits

The record suggests that Gibala's medical condition began in 1992, when she fell and injured

her back. (*See* Def.'s LR Resp. ¶ 14.) It is undisputed that Gibala stopped working on March 9, 1995 due to severe pain in her back, that she applied for long term disability benefits at some point thereafter, that Eaton awarded her such benefits, and that she began receiving them on September 5, 1995. (Def.'s LR Resp. ¶¶ 7, 10; Pl.'s LR Resp. ¶¶ 4, 6.) Gibala had several surgeries during the period in which she received benefits, including back surgery[2] in November 1995 (Def.'s LR Resp. ¶ 14), knee surgery[3] on March 18, 1998 (*see* Def.'s LR Resp. ¶ 14; AR 00090, 00244), and ankle surgery[4] in February 2003 (Def.'s LR Resp. ¶ 18).

It appears from the record that the administrator of the Plan monitored Gibala's physical condition during periodically the disability period. (*See* Pl.'s LR Resp. ¶ 10.) For example, Gibala underwent a physical examination, called a Functional Capacities Evaluation ("FCE"), in February 1998 at HealthSouth Rehabilitation Center. (*See* Def.'s LR Resp. ¶ 26; AR 00134-35.) The 1998 FCE concluded Gibala was not employable (AR 00135), and Gibala continued to receive benefits thereafter.

Broadspire also asked Gibala to periodically provide updated medical information. (Pl.'s LR Resp. ¶ 10.) Apparently as a result of one such request, Gibala submitted two forms completed by her treating physician, Dr. Stanislaw Maslanka in or about November or December 2003. (Pl.'s LR Resp. ¶¶ 11, 12.) Dr. Maslanka indicated on both forms that Gibala was capable of performing

---

[2] Specifically, Gibala underwent lumbar spinal fusion surgery (Def.'s LR Resp. ¶ 14), which is a surgical procedure whereby two adjacent vertebrae are made to grow together. J. E. Schmidt, *Attorneys' Dictionary of Medicine*, Vol. 5, S-240 (Matthew Bender 2005 (last updated)).

[3] Gibala had a meniscectomy, which is the surgical removal of the meniscus, or cartilage of the knee joint. *Id*. at Vol. 4, M-127.

[4] Specifically, Gibala underwent removal of fractured tibial sesamoid fragments and partial onychoplasties. (Def.'s LR Resp. ¶ 18.)

"sedentary" or "light" work.  (AR 00160, 00161.)

Specifically, on one of the forms, Dr. Maslanka checked a box next to the statement "Marked limitation of functional capacity/*capable of sedentary work*."  (AR 00160 (emphasis added).)  He did not check the box for the statement "Severe limitation of functional capacity/incapable of sedentary work."  (*Id.*)  He also noted that Gibala had achieved maximum medical improvement and that her prognosis was "poor."  (*Id.*; Pl.'s LR Resp. ¶ 12.)  On the other form, Dr. Maslanka checked a box next to the statement, "Sustainable (8-hour) energy expenditure" and indicated that Gibala was capable of "light" work.[5]  (AR 00161.)  While he noted that Gibala should "never" be stooping, crouching/squatting, kneeling, or crawling, there were other activities that she could do "frequently" or "constantly," such as reaching, walking, or sitting.  (*Id.*)

Apparently Dr. Maslanka's reports prompted the Plan to initiate two peer reviews of Gibala's medical file.  Neither peer reviewer personally examined Gibala, although each reviewed Gibala's available medical records.  (Pl.'s LR Resp. ¶ 13; *see also* Def.'s LR Resp. ¶¶ 27, 28.)  Each peer reviewer concluded that the available records did not support that Gibala was disabled from working at any occupation.  (AR 00130-31, 00133.)  Dr. Wendy Weinstein, a specialist in internal medicine, relied on, among other records, Dr. Maslanka's evaluation, as well as a statement by Gibala that she is able to cook, shop, do laundry, dust and do the dishes, and that she tries to go to church, watches some TV, reads, and works on the internet for a few minutes at a time.  (AR 00130-31.)  Dr. Vaughan Cohan, a neurologist, concluded that there was "no evidence to support continued disability for any occupation," noting that there was insufficient documentation to determine

_____

[5] The physician statement form defines "light" work as the ability to lift 11-20 pounds 0-33% of the day, 1-10 pounds 34-66% of the day, and a negligible amount 67-100% of the day.  (AR 00161.)

"whether the claimant has objective impairment with respect to her low back." (AR 00133.)

It appears that Dr. Maslanka's reports also prompted the Plan to initiate another FCE by HealthSouth, as well as a vocational assessment, to identify suitable and available jobs for Gibala. That FCE, conducted in March 2004, concluded that Gibala "is currently demonstrating the ability to perform at the 'Light' physical demand level within the material handling and positional tolerances set forth in this report . . . ."[6] (Pl.'s LR Resp. ¶ 14; AR 00141.) The FCE report noted that Gibala could sit for 2 ½ to 5 ½ hours per day, stand for 2 ½ to 5 ½ hours per day, and walk for 2 ½ to 5 ½ hours per day. (Def.'s LR Resp. ¶ 23; AR 00143.) The FCE evaluator also noted that Gibala "appeared to give consistent effort throughout the evaluation. However, her subjective reports of pain . . . were not supported by her physiological response as her heart rate decreased from 69 bpm to 62 bpm." (Pl.'s LR Resp. ¶ 14; AR 00141.)

Gibala's vocational assessment involved two reports, the Employment Assessment Report and the Labor Market Survey. The Employment Assessment Report identified several positions that were all "close or good matches" for Gibala's past relevant work, including Sorter/Pricer, Expediter Clerk, and Mail Clerk. (Pl.'s LR Resp. ¶ 15; AR 00119.)[7] The Labor Market Survey identified five specific job openings in Plaintiff's geographical area that were purportedly appropriate functionally and economically, including two that were considered "light duty" and three that were considered "sedentary/light duty." (Pl.'s LR Resp. ¶ 16.) The jobs identified were

---

[6] The FCE form defines "Light" physical demand as "[e]xerting up to 20 lbs. force occasionally, and/or up to 10 lbs. force frequently, and/or a negligible amount of force constantly to move objects." (AR 00141.)

[7] The Employment Report was based on a "file review" (although the only document specifically referenced is the 2004 FCE) and telephone interviews with Gibala on April 27, 2004 and May 3, 2004. (AR 00116, 00118.)

a temporary receptionist position, three permanent receptionist positions, and a temporary office clerk position. (AR 00126-28.)

Broadspire terminated Gibala's long term disability benefits as of September 30, 2004, shortly after the peer reviews, FCE, and vocational assessments were conducted. (Pl.'s LR Resp. ¶ 17.)

## III.    Gibala's First Appeal

Broadspire informed Gibala that she could appeal the termination, and that in order to assist with her appeal, she could provide additional clinical medical documentation that would support disability, including but not limited to the following: physical examination findings (with emphasis on the musculoskeletal and neurological examinations); diagnostic test results/imaging studies; diagnosis; x-ray results; observation of anatomical, physiological or psychological abnormalities; and medications and/or treatment plan. (AR 00218.)

Gibala appealed the decision terminating her benefits in a handwritten note dated September 30, 2004 enclosing several additional medical records. (Pl.'s LR Resp. ¶ 18.) Gibala submitted a number of additional medical records in subsequent months. Many of the records submitted with the appeal letter and in the following months were dated 2002 or earlier. (*See id*.) The only then-current records submitted were an August 11, 2004 MRI of the lumbar and thoracic spine regions (AR 00233-35), and an August 31, 2004 CT scan of the lumbar spine (AR 00236-37). (Pl.'s LR Resp. ¶ 18.) Those results showed the following: "Minimal right paracentral disc protrusions . . . at T6-7 and T7-8, with slight flattening of the right anterior aspect of the thoracic spinal cord, but no evidence of significant cord compression or intracord signal change."

(AR 00235.)

Gibala's new treating physician, Dr. John Vottero, a neurologist, also submitted a letter, dated December 2004, in support of Gibala's first appeal. (Pl.'s LR Resp. ¶ 24.) Dr. Vottero's letter stated in its entirety:

> Angelina Gibala has low back pain and bilateral leg pain due to a multilevel lumbar fusion done in 1995. She has been seen by several orthopedic surgeons who have recommended no further surgery.
> Mrs. Gibala is unable to return to work at this time due to her low back pain and leg pain.

(AR 00254.) No functional testing or examination results were attached to Dr. Vottero's letter. (Pl.'s LR Resp. ¶ 24.)

In response to Gibala's first appeal, Broadspire initiated three peer reviews of Gibala's medical file. (Pl.'s LR Resp. ¶ 19.) Those reviews were completed by three physicians, each of a different specialization: Dr. Jaime Wancier, M.D., neurosurgeon; Dr. James Wallquist, M.D., orthopedic surgeon; and Dr. Tamara Bowman, M.D., internal medicine. (*Id.* ¶¶ 20-22.)[8] All three peer review reports, which were dated approximately November 2004, concluded that there was insufficient documentation to support that Gibala was disabled from any occupation as of October 2004. (AR 00240, 00245, 00248.) All three reports also listed additional documentation that would be relevant to reconsideration of Gibala's claim, although the reports did not state that such documentation was required. (Def.'s LR Resp. ¶ 29; AR 00240, 00245, 00248.)

Dr. Wancier's report focused on the neurological aspects of Gibala's file. He stated that, based on the August 2004 MRIs and CT scan, "one can reasonably assume that [Gibala's] [spinal]

---

[8] Dr. Bowman and Dr. Wallquist are apparently in-house peer reviewers with Broadspire. *See Donovan v. Eaton Corp., Long Term Disability Plan*, 462 F.3d 321, 324, 325 (4th Cir. 2006).

fusion is stable," although he noted that the MRIs were "limited because of metallic artifacts." (Pl.'s LR Resp. ¶ 20; AR 00240.) Dr. Wancier also noted that he attempted to contact Gibala's treating physicians multiple times, but that such attempts were not successful. (Pl.'s LR Resp. ¶ 20.) Dr. Wallquist focused on records relating to orthopedics, and stated that Gibala's work restrictions should include avoiding repetitive bending, pushing, carrying, lifting, pulling over 25 pounds, climbing, twisting, reaching or working overhead, and prolonged standing, sitting or driving more than 30 minutes to one hour without rest periods of 5 to 10 minutes. (*Id.* ¶ 21.) Dr. Bowman focused on Gibala's complaints of weight loss, nausea, urinary incontinence, diabetes, and anemia. (*Id.* ¶ 22.) Dr. Bowman noted that there was no documentation of abnormal or positive results for any of those conditions. (*See id.*; AR 00248.)

In a letter to Gibala dated January 7, 2005, Broadspire denied Gibala's first appeal and upheld its original decision that Gibala did not meet the Plan's definition of disability. (Pl.'s LR Resp. ¶ 25; AR 00255, 00257.) The letter informed Gibala of her right to appeal a second time, and advised her of the types of medical documentation that would be supportive of her claim, including but not limited to: detailed office/consultation notes; comprehensive physical, musculoskeletal, and neurological examination reports emphasizing functional deficits, restrictions, and limitations; abnormal diagnostic tests/imaging studies; abnormal laboratory test results; and any other pertinent medical information that may substantiate her disability. (AR 00257.)

## IV.    Gibala's Second Appeal

In a letter dated July 1, 2005, Gibala, through her attorney, submitted her second (and final)

appeal, attaching additional medical records that included a June 2005 medical examination by Dr. Bernard Stevens, M.D. (Pl.'s LR Resp. ¶ 28; AR 00264.) Dr. Stevens concluded that Gibala was unemployable. (Def.'s LR Resp. ¶ 31; Pl.'s LR Resp. ¶ 29.) He stated that Gibala cannot sit, stand, or walk for "any meaningful period of time" and that she is unable to focus her concentration on any task due to discomfort. In addition to basing his conclusion on a physical examination of Gibala, Dr. Stevens considered a number of Gibala's medical records, including the August 2004 MRI results, an August 2004 "electrodiagnostic study," and the March 2004 FCE, as well as a number of records dated 2002 and earlier. (*See* AR 00271-72.) Dr. Stevens did not explicitly address Dr. Maslanka's 2003 conclusion that Gibala could work. (*See id.*)

Eaton, not Broadspire, handled Gibala's final appeal. (Pl.'s LR Resp. ¶ 31.) Ira Posner, M.D., orthopedic surgeon and pain management specialist, was retained to conduct a sixth peer review. (Def.'s LR Resp. ¶ 32; Pl.'s LR Resp. ¶ 30.) Eaton also submitted Gibala's entire file to the Medical Review Institute of America ("MRIoA"), which it characterizes as a "third party independent medical reviewer not connected with the Claims Administrator." (Def.'s LR Stmt. ¶ 35.) Neither of those reviews included a physical examination of Gibala.

Dr. Posner concluded in his report, dated July 19, 2005, that the documentation did not support that Gibala was precluded from working in any occupation. (Pl.'s LR Resp. ¶ 30; AR 00282.) He noted that Gibala should avoid lifting weight greater than 10-15 pounds, prolonged standing and walking, repetitive bending, work that required multiple repetitive activities, and sustained timed or demand work, and that she should be allowed to change position according to her needs. (*Id.*) Accordingly, Gibala would do better in a light clerical job position than in a heavy clerical job position. (AR 00279.) However, Dr. Posner concluded that Gibala could perform

sedentary to light duty work activity. (*Id*.)

The Plan contends that Dr. Posner reviewed Gibala's entire medical file. (Def.'s LR Stmt. ¶ 30.) Gibala denies that statement, but the only documentation that she identifies as having not been reviewed is a report of a neuropsychological examination by Dr. Patricia Lim in 2003 (discussed below). (Pl.'s LR Resp. ¶ 30.) However, it appears that Dr. Lim's report was forwarded to the Plan by Gibala's counsel after Dr. Posner completed his review. (*See* AR 00362.)

The initial MRIoA report, dated August 1, 2005, concluded that the medical records are insufficient to support that Gibala could not perform "sedentary work." (AR 00092.) In September 2005, Gibala's counsel submitted Dr. Lim's report dated December 17, 2003 to Eaton. (Pl.'s LR Resp. ¶ 36; AR 00362-69.) Eaton then submitted that report to the MRIoA for consideration and review. The same unidentified neurosurgeon who conducted the initial file review considered Dr. Lim's psychological findings and issued a subsequent report, dated September 19, 2005.[9] Although Dr. Lim noted Gibala's pain medication and multiple periods of repositioning due to pain and discomfort, she also reported that Gibala demonstrated good pain management strategies and ability to refocus despite her discomfort. (AR 00364-65.)[10] In spite of

---

[9] Gibala asserts that the MRIoA initial report and supplemental report were prepared by two different reviewers, and that the first reviewer did not review Dr. Lim's report, whereas the second reviewer reviewed only Dr. Lim's report and did not have any of Gibala's other medical records. (Pl.'s LR Stmt. ¶ 33.) The Plan denies that assertion, and notes that it requested that the same reviewer consider Dr. Lim's report when it was submitted by Gibala's counsel after the August 2005 report was prepared. (Def.'s LR Resp. ¶ 33, citing AR 00088.) Although the identity of the MRIoA reviewer was not revealed, the section describing the reviewer's history and qualifications is identical (AR 00086, 00093), and it is fair to infer that the same individual who prepared the initial report also completed the supplemental report, as the Plan requested.

[10] Interestingly, Dr. Lim reported that Gibala told her that "[s]he works in the area of real estate." (AR 00364.)

some difficulties, her memory was within the average to mild impairment range.  (AR 00367.)  Dr. Lim concluded that Gibala's intelligence, attention, and concentration were "functional" and within normal limits.  (AR 00366.)  Dr. Lim's concluded that dementia was not confirmed, and that although Gibala was experiencing emotional stressors from her family situation and that her pain and pain medication might contribute to her memory problems, Gibala's memory was "quite functional when she is knowingly aware that she must attend to information."  (AR 00368.)  The supplemental MRIoA report concluded that nothing in Dr. Lim's report indicated that Gibala could not obtain or hold employment.  (AR 00086.)

In a letter to Gibala's counsel dated September 22, 2005, Eaton informed Gibala that her final appeal was denied.  (Pl.'s LR Resp. ¶ 39; AR 00069, 00083.)  Eaton's final determination was to uphold the administrator's initial decision to discontinue Gibala's long term disability benefits as of October 1, 2004 on the basis that Gibala no longer met the Plan's definition of disability.  (Pl.'s LR Resp. ¶ 39.)  Gibala filed this lawsuit on October 7, 2005.

## LEGAL STANDARDS

### I.    Summary Judgment

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court

must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id*. at 255. The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

On cross-motions for summary judgment, the merit of each party's motion is considered separately and all factual uncertainties are resolved and all reasonable inferences are drawn against the party whose motion is under consideration. *Benion v. Bank One, Dayton, N.A.*, 967 F. Supp. 1031, 1035 (N.D. Ill. 1997); *see also Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003).

## II.     ERISA

"Ordinarily, a denial of benefits [under ERISA is] reviewed *de novo*," but where "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the decision is "reviewed under an arbitrary and capricious standard." *Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 989 (7th Cir. 2005) (citations and internal quotations omitted). The parties do not dispute that the Plan language contains language sufficient to confer discretionary authority on the administrator. (*See* Pl.'s Mem. at 5-6.) The more deferential arbitrary and capricious standard therefore applies.

Under that standard, a decision to deny benefits will be upheld "so long as that decision has rational support in the record." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir.

2006) (internal quotations and citation omitted). "[Q]uestions of judgment are left to the plan administrator, and it is not [the court's] function to decide whether [it] would reach the same conclusion as the administrator." *Id.* (internal quotations and citations omitted); *see also Kobs v. United Wisc. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005) ("Under the arbitrary and capricious standard, we do not ask whether the administrator reached the correct conclusion or even whether it relied on the proper authority." (citation omitted)). "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Davis*, 444 F.3d at 576 (citation omitted). Courts are to "consider only the evidence that was before the administrator when it made its decision." *Militello v. Central Sts., S.E. & S.W. Areas Pens. Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (internal quotations and citation omitted).[11] However, even where the administrator or fiduciary has discretionary authority, the plan procedures must "afford a reasonable opportunity . . . for a full and fair review" of dispositions adverse to the participant. 29 U.S.C. § 1133(2).

Thus, on the Plan's motion for summary judgment, the court considers whether, taken in the light most favorable to Gibala, there is no evidence that the Plan's termination of benefits was arbitrary and capricious. *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006).

## ANALYSIS

### I.  Rational Support in the Record

The Plan identifies the following evidence to support the administrator's decision: (1) the

---

[11] In a proper case, specific evidence outside the administrative record demonstrating actual bias on the part of medical reviewers might be used to show a conflict of interest. *See Davis*, 444 F.3d at 575. However, no such evidence has been submitted in this case.

determination by Gibala's treating physician, Dr. Maslanka, around November or December 2003 that Gibala was capable of performing sedentary or light work; (2) the conclusion of the March 2004 FCE that Gibala was capable of performing light work; and (3) the conclusion of six peer reviewers that the record contained insufficient evidence to support the conclusion that Gibala was not capable of performing the duties of any occupation. (Def.'s Mem. at 5-7.) Gibala makes a number of arguments, which are considered in turn.

Gibala argues that her condition is degenerative, and that there is no evidence that she improved so as to justify the termination of benefits. (Pl.'s Mem. at 6.) A termination of benefits may be arbitrary and capricious where the record is devoid of any evidence of medical improvement. *See Carugati v. Long Term Disability Plan for Salaried Employees*, No. 01 C 5863, 2002 WL 441479 at *8 (N.D. Ill. Mar. 21, 2002) (Conlon, J.). Here, the Plan cites records that indicate improvement. (Def.'s Resp. at 4-5.) In January 2000, Gibala's then-treating physician (Dr. Freitag) stated that Gibala was not able to work and that it was not clear whether she ever would be able to work. (AR 00155, 00157.) Three years later, however, Gibala's then-treating physician (Dr. Maslanka) stated that Gibala could work. In 1998, Gibala's FCE concluded that she could not work, whereas in 2004, the FCE (conducted by the same rehabilitation center) concluded that Gibala could work. In this case, the record is not devoid of any evidence of medical improvement.

Gibala also argues that there is sufficient objective medical evidence in the record to support her disability. (Pl.'s Resp. at 4.) Although Gibala is critical of the requirement of objective evidence (*see id.*), the Plan language explicitly requires that a finding of a covered disability be supported by "objective findings" such as physical examination findings, diagnostic test results, imaging studies, diagnosis, x-ray results, observation of physical or mental abnormalities, and

medications. (AR 00052.) As discussed above, Gibala submitted certain records in connection with her first appeal, many of which were prior to Dr. Maslanka's 2003 report, but also an MRI and CT scan from 2004, as well as the letter from her then-treating physician, Dr. Vottero. In connection with her second appeal, Gibala, through her attorney, submitted additional medical records and the reports of Dr. Stevens and Dr. Lim. Gibala also points to the various pain medications that she takes.       Gibala's records were considered by the Plan's reviewers, who concluded that the records showed limitations on Gibala's activity, but not an inability to perform light and sedentary work. (*See, e.g.*, AR 00240.) Dr. Bowman, for instance, listed Gibala's medications but nevertheless concluded that the documentation was insufficient to support that Gibala was precluded from performing the work of any occupation. (AR 00247-48.) As for Dr. Lim's report, Gibala is correct that only one peer reviewer, the MRIoA neurosurgeon, appears to have considered it. However, that neurosurgeon concluded that "[n]othing in the [Lim] report indicated that the patient could not obtain or hold employment." (AR 00086.)

Gibala argues that the opinions of the Plan's reviewing doctors, when weighed against the first hand observations of her treating physicians, cannot support terminating her benefits. (Pl.'s Resp. at 5.) Gibala emphasizes the conclusions of Dr. Vottero in December 2004 and Dr. Stevens in June 2005 that Gibala could not work, and notes that those conclusions were based on physical examinations while the Plan's reviewing physicians reviewed only her medical records. Differences in opinion between the treating and reviewing physicians, however, are not sufficient to make a denial arbitrary and capricious. *Semien*, 436 F.3d at 812. Plan administrators are not required automatically to accord special deference to the opinions of a claimant's treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

As the Plan points out, in order to continue to obtain benefits after the initial 24 months, Gibala must be "totally and continuously unable to engage in *any* occupation or perform *any* work for compensation or profit for which [she is], or may become, reasonably well fitted by reason of education, training or experience."  (AR 00047 (emphasis added).)  Gibala concludes that because Dr. Maslanka did not release Gibala to return to her own occupation, he did not release her to any occupation.  (Pl.'s Mem. at 3, 6, 9; *see* Pl.'s LR Resp. ¶¶ 11, 12.)  However, that is not a correct reading of Dr. Maslanka's reports, as described above.  Dr. Vottero's conclusion that Gibala is "unable to return to work at this time" (AR 00254) is somewhat ambiguous, because it is not clear whether he means that she is unable to perform any work, or unable to return to her prior work.  Dr. Vottero attached no functional testing or examination results, and the text contains no explanation for his conclusion.  While Dr. Stevens apparently performed an independent medical examination of Gibala and reviewed her medical file, he is not her treating physician.  Also, his report notes a consultation done for Dr. Maslanka in 2002 (AR 00271), but does not explicitly address Dr. Maslanka's 2003 reports or Dr. Maslanka's conclusion that Gibala could work at the light or sedentary level, at a time when Dr. Maslanka was Gibala's treating doctor.

Likewise, the Social Security Administration's decision to award Gibala benefits does not mean that the denial of benefits by the Plan is arbitrary and capricious.  Social Security benefits are determined by a uniform set of federal criteria, while the entitlement to benefits under an ERISA plan depends, in large part, on the terms of the plan at issue.  *Nord*, 538 U.S. at 833.  Although an award of Social Security benefits is a factor to be weighed in the claimant's favor, such an award is not determinative.  *See Tegtmeier v. Midwest Operating Engrs. Pen. Trust Fund*, 390 F.3d 1040, 1046-47 (7th Cir. 2004); *Halpin v. W. W. Grainger, Inc.*, 962 F.2d 685, 695 n. 11 (7th Cir. 1992).

The fact that Gibala had been found eligible for Social Security disability benefits was part of the record reviewed by MRIoA. (AR 00090.)

Finally, Gibala argues that because the examining physicians and the FCE evaluator placed physical restrictions on her, it can be inferred that "[a]ll examining and treating physicians are . . . in complete agreement that Gibala cannot return to work." (Pl.'s Mem. at 9.) The denial of benefits has been held to be arbitrary and capricious where the examining doctor found that the claimant could work for an extremely limited period of time under severe physical limitations. *See, e.g., Ladd v. ITT Corp.*, 148 F.3d 753, 755-56 (7th Cir. 1998) (denial arbitrary and capricious where, among other things, an examining physician opined that claimant might be able to work for four hours per day if she did not need to move her neck much); *Nickola v. CNA Group Life Assurance, Co.*, No. 03 C 8559, 2005 WL 1910905 at *9 (N.D. Ill. Aug. 5, 2005) (Filip, J.) (denial was arbitrary and capricious even though treating doctor had said claimant could probably hold a sedentary job—doctor also noted claimant would probably have to miss up to several days of work per week); *see also Poulos v. Motorola Long Term Disability Plan*, 93 F. Supp. 2d 926, 931-32 (N.D. Ill. 2000) (denial arbitrary and capricious even though examining doctor found claimant (a 59-year-old woman who had been out of the workforce for 13 years) might be able to do light or sedentary work that did not involve much lifting).

However, the restrictions the FCE evaluator placed on Gibala's ability to do light work are not as restrictive as were the conditions in those cases. The 2004 FCE, which was based on a physical examination of Gibala, restricted her to sitting for 2 ½ to 5 ½ hours per day, standing for 2 ½ to 5 ½ hours per day, and walking for 2 ½ to 5 ½ hours per day. Dr. Maslanka also noted that Gibala can do light work, defined as being able to "lift 11-20 pounds 0-33% of the day; 1-10 pounds

34-66% of the day; and a negligible amount 67-100% of the day." (AR 00143, 00161.) The Employment Assessment Report determined that Gibala could find a position that would accommodate her limitations, even considering her age and education. (Pl.'s LR Resp. ¶ 15; AR 00116-122.) Gibala disagrees with that conclusion, referring to Dr. Lim's report as evidencing additional cognitive impairments. (*See* Pl.'s LR Resp. ¶ 15.) However, Dr. Lim's report does not conclude that Gibala's cognitive impairments preclude any employment. On the contrary, Dr. Lim states that Gibala is experiencing emotional stressors and reporting memory disturbance due to pain, but that her memory is functional.

Under the arbitrary and capricious standard, the court "do[es] not ask whether the administrator reached the correct conclusion," *Kobs*, 400 F.3d at 1039, or "whether [it] would [have] reach[ed] the same conclusion as the administrator," *Davis*, 444 F.3d at 576 (internal quotations and citations omitted). The court asks only whether it is possible to offer a reasoned explanation for the denial of benefits based on the evidence available to the administrator at the time of the denial. *Militello*, 360 F.3d at 686; *Ruiz*, 400 F.3d at 991. If there is rational support in the record for the decision, it is not arbitrary and capricious.[12] *Davis*, 444 F.3d at 576.

---

[12] Following briefing and argument in this case, Gibala submitted supplemental authority, *Donovan*, 462 F.3d 321, a decision by the Court of Appeals for the Fourth Circuit affirming a district court decision against the same defendant named in this case. [Dkt 42.] The Plan filed a "Response to Notice of Citation of Supplemental Authority" on September 13, 2006. [Dkt 44.]

The *Donovan* decision does not change the outcome of this case. The facts upon which the court in *Donovan* found the administrator's denial of benefits to be an abuse of discretion do not exist in this case. There, the administrator ignored the affidavit of the claimant's treating physician who had changed his opinion from the time of his initial evaluation four months earlier. 462 F.3d at 328-29. The physician had initially opined that he "did not feel any additional surgical intervention would be warranted and felt that the claimant would be able to function within a sedentary capacity." *Id.* at 328. The physician later changed that opinion, however, in light of new tests that indicated the plaintiff's back problems were worsening. He stated in a later affidavit that "he did not feel the claimant could perform in any type of sedentary

Looking at the medical evidence, it cannot be said that the Plan's conclusion is without rational support in the record. The existence of some evidence in the record favoring Gibala's position is not sufficient to overturn a denial of benefits under a deferential standard of review. *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) (holding that decision to deny benefits was not arbitrary and capricious where claimant's physicians opined he should not perform high stress work due to coronary heart disease, hypertension, and gout; denial of benefits was supported by opinion of insurer's independent cardiovascular specialist that claimant could return to work); *Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 996 (7th Cir. 2004) (holding that denial of benefits had reasonable basis even though tests showed herniated disc in claimant's spine; record also contained opinions of two orthopedic physicians who concluded that claimant's back injury did not limit her ability to work).

## II.    Full and Fair Review

Gibala also argues that she did not receive a "full and fair" review of her file. (Pl.'s Mem. at 11.) A full and fair review requires, among other things, that the decision-maker consider the evidence presented by both parties. *Halpin*, 962 F.2d at 689 (stating that the "core requirements of review intended to be full and fair include knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the

---

job on a full-time and consistent bases [sic]." *Id.* The Fourth Circuit affirmed the district court's conclusion that the "wholesale disregard" of the later affidavit in favor of the earlier statement that had been based on incomplete information, was unreasonable. *Id.* at 329. In the present case, the record does not suggest that the Plan's reviewers disregarded any evidence comparable to that submitted in *Donovan.*

decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision") (quotations and citations omitted).

Gibala claims that the "critical error" is that no Plan reviewer looked at "the big picture of Gibala's disabilities by looking at the way each impairment adds to her total disability." (Pl.'s Resp. at 1; Pl.'s Mem. at 11-12.) The record, however, does not support that argument. While some of the peer reviewers may have focused on only one aspect of Gibala's file, *e.g.*, Dr. Bowman for internal medicine, Dr. Wallquist for orthopedics, and Dr. Wancier for neurology, other peer reviewers, such as the sixth peer reviewer Dr. Posner and the MRIoA reviewer, considered all of Gibala's impairments in combination, based on the evidence she presented to them. As discussed above (n. 9), Gibala's argument that the first and supplemental MRIoA reports were by different reviewers is not supported by the record.

Additionally, Gibala's argument that no reviewer considered the "co-morbid effect" of Gibala's impairments (Pl.'s Resp. at 2), assumes that there were objective findings (as required by the Plan) supporting all of her claimed impairments. Dr. Bowman concluded that there were no current clinical findings to support Gibala's claims of anemia, diabetes, nausea and abdominal pain. Gibala does not point to any medical findings in the record that contradict Dr. Bowman's conclusion. (*See* Pl.'s LR Resp. ¶ 22.)

Gibala observes that the Plan's peer reviewers noted, in response to a standard question, that "additional documentation" could be submitted that would be "relevant to reconsideration of this claim . . . ." (AR 00245.) However, the reviewing doctors never stated they needed additional documentation in order to reach a conclusion. Gibala was afforded several opportunities to provide additional objective supporting documentation, including each time she submitted her appeal letters,

as well as other times during the appeals process when she was permitted to supplement the documentation already provided.

Gibala also challenges the reliability and verity of the MRIoA report on the basis that it was never signed and that the identity of the MRIoA neurosurgeon was never disclosed. (Pl.'s Mem. at 10; Pl.'s Resp. at 3.) Gibala, however, does not cite any ERISA requirement or any term of the Plan that requires an evaluation to be signed, and instead cites case law relating to the denial of Social Security benefits, which is not on point.

Gibala does cite (Pl.'s Resp. at 3) an ERISA requirement that, to be deemed full and fair, a disability plan's claims procedures must provide for the identification of medical experts whose advice was obtained on behalf of the plan in connection with the denial of a claimant's benefits. 29 C.F.R. §§ 2560.503-1(h)(3)(iv), 2560.503-1(h)(4). Specifically, those regulations provide, in relevant part:

> The claims procedures of a [plan providing disability benefits] will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless . . . the claims procedures . . . (iv) [p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination . . . .

*Id.*

Gibala argues that the Plan's consultation with the unidentified MRIoA reviewer violates those regulations. (Pl.'s Resp. at 3.) The regulations, however, do not forbid consultation with an unidentified MRIoA reviewer. Instead, the regulations simply require plans to provide a procedure whereby participants can discover the identification of the reviewers. Indeed, Gibala never explicitly argues that the Plan lacked such a procedure. Likewise, Gibala never argues that she

sought the identity of the reviewer pursuant to the plan procedures but was denied that information.

Gibala also argues that the fact that the MRIoA reviewer was not identified raises doubt about whether the reviewer had specialized expertise, as required by ERISA regulations. (*Id*.) However, the qualifications of the MRIoA reviewer are set out in the reports. (AR 00086, 00093.) Specifically, the reviewer held the position of Staff Neurosurgeon at two hospitals and has been in private practice since 1991. (*Id*.) He is a "Diplomate of the American Board of Neurological Surgeons and a member of American College of Surgeons, the North American Spine Society, the American Association of Neurologic Surgeons, the American Paraplegic Association, and the Congress of Neurological Surgeons." (*Id*.) He has also "served as Chairman of the Bioethics Committee and the Pain Improvement Committee at a medical center" and "is a published author in his field and has given numerous presentations." (*Id*.)

Gibala objects to the fact that neither Broadspire nor Eaton ever had Gibala examined, and instead relied only on file reviews. (Pl.'s Mem. at 7-9.) There is no requirement that a benefits plan must refer a claimant to a physician for a physical examination. *Davis*, 444 F.3d at 577. A denial of benefits is not necessarily arbitrary and capricious even if the reviewing doctors based their determination on a file review. *Id.* at 577, 578.

Gibala suggests that because the reviewing physicians were retained by the Plan, they may have a conflict of interest. (Pl.'s Resp. at 2-3.) To succeed with the conflict-of-interest argument, Gibala could have produced evidence that the reviewers had a stake in the outcome of the case, separate and apart from the fact that they were being compensated by the administrator for their work. *Davis*, 444 F.3d at 575-76. Gibala has not made such a showing.

Finally, Gibala argues that the review was not full and fair because her age (58) and her

absence from the workforce for ten years were not considered. (Pl.'s Mem. at 12-13; Pl.'s Resp. at 7.) In fact, the vocational assessment did take into account Gibala's age, work history and education. (*See* Pl.'s LR Resp. ¶ 15.) Essentially, Gibala disagrees with the result of the assessment, and argues that "no employer would realistically hire a 58 year old woman with extreme back pain who has problems with memory and cognition." (Pl's Resp. at 8.) However, as discussed above, the objective medical records are not as favorable to her as Gibala suggests. The court's review is limited to whether the Plan's conclusion was arbitrary and capricious; the court does not decide whether it would reach the same conclusion. *Davis*, 444 F.3d at 575, 576.

Gibala has not established that she did not receive a full and fair review.[13]

### CONCLUSION

For all the foregoing reasons, Gibala's motion for summary judgment is denied and the Plan's motion for summary judgment is granted.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**Dated: November 30, 2006**

---

[13] Following briefing and argument in this case, both parties submitted opinions by district courts in other districts in other circuits regarding appeals from decisions by Eaton to deny benefits. The court has reviewed those decisions and does not find that a discussion of those opinions would add anything to the consideration of this case.